**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

|  |  |
|---|---|
| HEARTLAND PAYMENT SYSTEMS, INC. | : |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| MICROS SYSTEMS, INC., | : |
| MERCHANT LINK, LCC, and | : |
| CHASE PAYMENTECH SOLUTIONS, LCC | : |
| | : |
| | : |
| Defendants. | : |

_____:

Civil Action No. 3:07-cv-5629-FLW

**Opinion**

**WOLFSON**, **United States District Judge**:

Presently before the Court is a motion by MICROS, Merchant Link, and Paymentech ("defendants"), to dismiss the federal antitrust and state law unfair competition claims of plaintiff Heartland ("Heartland") pursuant to Fed. R. Civ. P. 12(b)(6). Defendants assert that Heartland has failed to adequately plead its tying and conspiracy claims, and further, that Heartland lacks standing to bring its tying claim. In the event that the Court dismisses the federal claim, Defendants asserts that the Court should exercise its discretion to dismiss Heartland's state law claim.

For the following reasons, Defendants' motion to dismiss is denied in its entirety.

**I. Background And Procedural History**

Since Defendants move to dismiss Heartland's complaint pursuant to Fed. R. Civ. P.

1

12(b)(6), all facts alleged in the complaint are assumed to be true.

Heartland is a credit and debit card processing corporation incorporated in Delaware with its principle place of business in New Jersey. Complaint, ¶ 15. Heartland provides credit and debit card processing and additional services for more than 160,000 restaurants, hotels and retail merchants throughout the United States. Id.  Defendant MICROS is the leading developer of restaurant point-of-sale ("POS") information systems, including hardware and software for such systems and operational applications, as well as back office applications that include inventory, labor and financial management.  Id. ¶ 16. Defendant Merchant Link is a network-based gateway company that provides merchants with a single interface to connect with all major payment processors, such as Heartland and Paymentech. Merchant Link is a wholly owned subsidiary of Paymentech. Id. ¶ 17. Defendant Paymentech is the largest payment processor in the world and is therefore a direct competitor of plaintiff Heartland. Id. ¶18.

To understand the tying and conspiracy theories alleged in the complaint, it is necessary to understand how credit card transactions are processed in the restaurant business. A restaurant merchant purchases a POS information system, from a company such as MICROS, "which is the modern-day equivalent of cash registers of the past" and "enable[s] a merchant to, inter alia, take debit and credit card payments from customers," Id. ¶ 19.  In order to process credit and debit card transactions, the merchant also requires the services of a processing company such as plaintiff Heartland or defendant Paymentech. Merchants pay processors on a fee-per-transaction basis. Heartland's per transaction fee ranges from $0.01 to $0.12, depending on the volume of transactions for the particular merchant. Id. ¶ 49.

Further, the merchant's POS system must be connected with the processing company's

computer, and this requires an interface: "In order for credit or debit card transactions to be processed, an interface - which is a software program that enables the transfer of transaction data between the merchant's POS system and the processing company's computer - is required." Id. ¶ 33. This interface is traditionally provided in one of two ways. Id. One method is to have a direct interface between the POS system and the processor. "This is to say that, when a merchant purchases a POS system, the POS system will already have one or more interfaces in it to connect directly with one or more processors. If the POS system does not have an interface to the merchant's preferred processor, the merchant can arrange for such an interface for an additional charge." Id. ¶ 33. The second method involves using a software program or "gateway" that "acts as a terminal to which the transaction data from a POS system is routed . . . and … transferred to any number of processing companies." Id. ¶ 34. Third party companies provide gateway services and charge merchants an additional fee per transaction. Id.  ¶¶ 34-35.

Heartland's antitrust claims, based on tying and a conspiracy to restrain trade, attack the same underlying conduct. Heartland alleges that MICROS has market power in the table service POS system market, with a market share in excess of fifty percent in that market, Id. ¶ 32,[1] and further, that defendants are engaged in a scheme to use MICROS' market power in furtherance of an illegal anti-competitive arrangement. Heartland alleges that "MICROS and Merchant Link entered into an agreement pursuant to which MICROS' devices exclusively use Merchant Link services for the transmission of electronic transactions . . . from MICROS' terminals and network and help desk services for such terminals." Id. ¶ 37. Hence, "only Paymentech's subsidiary

---

[1] Heartland also alleges that MICROS has a market share in excess of forty percent in the broader market for POS systems used by all restaurants, including both quick service and table service restaurants.

Merchant Link can serve as the interface for any transaction emanating from a MICROS POS system." Id. "MICROS . . . imposes on purchasers of its POS systems the condition that they use only Merchant Link." Id. ¶ 40. It follows that the arrangement between MICROS and Merchant Link allegedly (1) precludes a merchant from obtaining a direct interface between its MICROS POS system and a processor and (2) precludes a merchant from using a gateway other than defendant Merchant Link to connect to a processor.[2]

An important part of the arrangement is that Merchant Link's gateway fees are allegedly atypical in at least two ways. First, although "[g]ateways are a service provided by third-party software companies, who charge merchants an additional fee for each transaction," Id. ¶ 34, the "Defendants have arranged it so that the gateway fee is billed to the processors, rather than to merchants directly." Id. ¶ 36. In other words, Heartland and other processors who compete with Paymentech are charged Merchant Link's gateway fee, not the merchants who purchase MICROS' POS system. Second, Merchant Link charges an allegedly supracompetitive rate for its services. Gateway charges are "commonly volume-driven" and "a large restaurant chain would be able to obtain a lower gateway fee rate of $0.01 to $0.02 (or even less) per transaction." Id. ¶ 35. "Merchant Link, however, charges a supracompetitive rate for its 'services.' Instead of the

---

[2]It is unclear from the complaint whether merchants could purchase a direct interface from processors like Heartland, or whether a direct interface must either come with a POS machine, or be purchased from a POS manufacturer. If the latter, then it is MICROS' decision not to sell a direct interface for its POS machine, not the agreement at issue, that prevents merchants from obtaining a direct interface to processors like Heartland. However, the complaint implies the former: "Indeed, Paymentech's competitors [,e.g., Heartland,] would provide the same interface to MICROS POS transactions as Merchant link at no additional cost to merchants." Complaint, ¶ 4 (emphasis added). In any event, even if Heartland and other processors do not provide a direct interface for MICROS systems, the agreement between MICROS and Merchant Link still prevents merchants from using competing gateway services. In other words, the allegations of the complaint allege that the agreement has anti-competitive consequences in the gateway market.

usual volume-driven per transaction fee, Merchant Link - taking full advantage of the exclusive arrangement afforded to it by MICROS - charges a flat rate of $0.04 per transaction . . . regardless of transaction volume." Id. ¶ 38.

Further, Merchant Link's alleged supracompetitive rate "cannot be challenged because of the tie imposed by MICROS customers," Id., i.e., merchants can only use MICROS POS systems, the alleged leader in the table services POS system market, on the condition that they refrain from using any interface other than Merchant Link's gateway. Because Paymentech owns Merchant Link, Paymentech is the only processor in the market who can avoid Merchant Link's gateway fee when servicing merchants who use a MICROS system. "Paymentech, as the ultimate owner of the gateway, is free to avoid this gateway fee - in whole or in part - since Paymentech would merely be charging itself for the use of its own gateway. This benefit is not shared by Paymentech's competitors, whose costs have been uniformly raised by this unorthodox MICROS-Merchant Link pricing arrangement." Id.¶ 36.

Heartland alleges the supra competitive rate charged by Merchant Link in the interface market weakens competition in the processing market by inflating the costs of processing for all processors (who service MICROS-using merchants) except, of course, Paymentech. Id. Since Paymetech can avoid the Merchant Link gateway fee when providing processing services to merchants who use MICROS POS systems, this "allows Paymentech to increase its price to merchants while still under-bidding its competitors [, e.g., Heartland] every time." Id. Paymentech can underbid Heartland and other processors who, in order to avoid operating at a loss, must "pass on the [Merhant Link] fee to the merchant, resulting in an artificially high charge

to the merchant." Id. ¶ 44.[3] Since Paymentech is not subject to Merchant Link's gateway fee, it can underbid Heartland and other processors in the processing market, which has allegedly been inflated by defendants' arrangement. Id. ¶¶ 45, 46.[4] "The MICROS-Merchant Link tie . . . has eliminated price competition and raised the cost of processing from a MICROS POS such that a transaction which previously cost the merchant $0.04 to process with Heartland now costs . . . $0.08." Id. ¶ 57. "Paymentech can undercut Heartland by agreeing to charge the merchant $0.06 per transaction, because it can absorb the Merchant Link fee, reap a $0.02 benefit over the competitive rate and still be $0.02 cheaper than the competition [, such as Heartland.] Id. As a result, "Heartland has lost significant market share in MICROS using restaurants since the inception of defendants' scheme." Id. ¶ 53. Heartland estimates its lost profits from losing customers in the restaurant POS processing market to be in excess of  $10 million.  Id. ¶ 67. Additionally, because of Merchant Link's gateway fee, Heartland has "lower profit margins on customers [using a MICROS system that] Heartland is able to" procure or retain. Id. ¶ 54.

---

[3]"[A] transaction which would cost a non-MICROS using customer of Heartland $0.03 to $0.04 costs Heartland's customers who use MICROS with a high-speed connection $0.07 to$0.08." Complaint, ¶ 49.

[4] Heartland describes the effect of defendants' arrangement as follows. "For example, when a Heartland customer purchases a MICROS POS system for its restaurant it soon discovers that it cannot continue to process with Heartland at the rate to which it is accustomed. The merchant is informed (most often by Heartland) that the processing from a MICROS system entails an additional charge of $0.04 a transaction, often double their previous rate, because of the fee imposed by Merchant Link. The merchant is told that Heartland can do nothing about the additional charge because MICROS requires Heartland to use Merchant Link, even though there is no practical reason for the requirement. The merchant discovers that it is bound by its MICROS agreement and cannot opt out of the Merchant link 'service.'The merchant next is told (most often by its MICROS distributor) that if he switches his processing to Paymentech, Paymentech, because it owns Merchant Link, will be able to charge a rate lower than that available from Heartland." Id. ¶ 52.

Heartland alleges MICROS both fails to disclose and intentionally conceals the nature of

the above arrangement:

> [N]either MICROS nor its agents specifically disclose the Merchant Link tie-in,
> or the exorbitant fee that accompanies it, to its customer in its sale and
> maintenance agreements. In fact, MICROS sales personnel intentionally conceal
> the Merchant Link fee from prospective merchants prior to sale. Consequently, the
> vast majority of merchants who purchase a MICROS POS system do not find out
> - and indeed, do not have the means to find out - about the exorbitant Merchant
> Link fees until after they have purchased their MICROS system.

Id. ¶ 51. Moreover, merchants are "locked in" by the MICROS-Merchant Link arrangement

because, "as MICROS POS systems cost in excess of $24,000.00, the cost of switching to a

different, non-MICROS POS system so as to avoid the Merchant Link fee is too high for most, if

not all, restaurant merchants." Id.

Heartland alleges that all of the defendants benefit from, and thus have an incentive to

agree to and participate in, the above anti-competitive arrangement. Merchant Link receives its

gateway fees at a supracompetitive rate. Paymentech "can under-bid Heartland and other low cost

processors and get more customers," while its competitors, "well aware of Paymentech's

competitive advantage, are forced to forgo virtually all profit in a losing attempt to maintain

market share." Id.¶ 7. Further, the arrangement "provides Paymentech with an advantage in

bidding for processing business because it knows from its gateway [,i.e., from Merchant Link, its

subsidiary,] the identity of any new merchant that is coming on line with Mircros well before the

competition does," which is "competitively valuable information." Id. MICROS benefits because

"[p]art of the Merchant Link fee collected by Paymentech is paid by Paymentech to MICROS.

This per transaction stream of revenue is hidden from MICROS' customers and allows MICROS

to secretly derive revenue over and above what it achieves from the sales and services of its POS

systems.  Id. ¶ 8. Additionally, MICROS benefits because "the effect of the Merchant Link tie shifts the entire technical support burden away from MICROS and its distributors and puts the expense and burden on the processor." Id.

Finally, Heartland alleges that there is no legitimate business reason for MICROS to require merchants to use Merchant Link as an interface. Heartland alleges:

> There is . . . no legitimate business reason that merchants be forced to use Merchant Link over any other third party gateway provider or the processors' own interface. Gateway services can be provided by an number of software companies. Further, the services that Merchant Link provides to merchants are illusory, because they do not provide any added value. There is no increased efficiency or security associated with use of Merchant Link. There is nothing special about the 800 numbers, dedicated lines or internet gateway offered by Merchant Link. Indeed, these same services are provided by - and, in practice, are actually rendered by - the processor. . . The only purpose in interposing Merchant Link between the POS system and the processor is to impose fees on Paymentech's competitors.

Id. ¶ 43.

On November 26, 2007, Heartland brought this lawsuit, attacking the above scheme through tying and general conspiracy claims under the 15 U.S.C. §1. Heartland charges defendants with an unlawful tying arrangement that uses MICROS' market power to unlawfully force merchants to use only Merchant Link's gateway, resulting in a not insubstantial amount of commerce being affected. Id. ¶¶ 61-66.  Heartland also charges defendants with a conspiracy to unreasonably restrain trade, and specifically, to raise the costs of Paymentech's competitors and increase Paymentech's market share.  Id.  ¶ 72.  Lastly, Plaintiff charges Defendant Paymentech with unfair competition under New Jersey law. Id. ¶ 77. The complaint seeks to recover treble damages under § 4 of the Clayton Act, 15 U.S.C. §15, including but not necessarily limited to (1) the $2.7 million Heartland pays Merchant Link annually, (2) lost profits as a result of lost

business, believed to be in excess of $10 million, and (3) lower profit margin on existing customers who use Merchant Link. Id. ¶ 74.

## II. Discussion

## A. Standard Of Review

When considering a motion to dismiss a complaint pursuant to Fed R. Civ. P. 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quotation marks omitted). Fed. R. Civ. P. 8(a)(2) requires a short and plain statement showing that the plaintiff is entitled to relief. In Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955 (2007), the court elaborated on the short and plain statement requirement with respect to concerted action element of an antitrust conspiracy claim:

> While a complaint attacked by a Fed. R. Civ. P. 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level. . . . [S]tating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

Id. at 1964-65. The Third Circuit has made clear that this analysis applies outside the antitrust context, and a fortiori, to other elements of an antitrust violation:

> The Supreme Court's Twombly formulation of the pleading standard can be summed up thus: "stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest" the required element. [Twombly, 127 S.Ct. at 1965]. This "does not impose a probability requirement at the pleading stage," but

instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. <u>Id.</u>

 "That is to say, there must be some showing sufficient to justify moving the case beyond the pleading to the next stage of litigation." <u>Phillips</u>, 515 F.3d at 234-35.

**B.  Heartland's Tying Claim**

**1. Has Heartland Adequately Plead A Tying Arrangement?**

According to the Supreme Court's interpretation of federal antitrust law,[5] a tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer purchases a different product, or at least agrees that he will not purchase that product from any other supplier." <u>Eastman Kodak Co. v. Image Technical Serv., Inc.</u>, 504 U.S. 451, 461 (1992) (quoting <u>N. Pac. Ry. Co. v. United States</u>, 356 U.S. 1, 5-6 (1958)).  "[W]here (1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product market; and (3) a substantial amount of interstate commerce is affected, then the defendant's tying practices are automatically illegal without further proof of anticompetitive effect." <u>Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.</u>, 959 F.2d 468, 477 (3d Cir. 1992) (citing <u>N. Pac. Ry. Co.</u> , 356 U.S. at 5); <u>Brokerage Concepts Inc. v. U.S. Healthcare, Inc.</u>, 140 F.3d 494, 512-13 (3d Cir. 1998).

Defendants do not here argue that Heartland has failed to adequately plead the second or third elements of a <u>per se</u> tying claim.[6] Instead, Defendants claim that the complaint fails to

---

[5] The Sherman Antitrust Act, 15 U.S.C. § 1, provides that, "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is . . . illegal." Section 4 the Clayton Act, 15 U.S.C. § 15, enables private parties injured by antitrust violations to maintain a private action for treble damages.
[6] Thus, the Court need not distinguish between <u>Heartland</u>'s <u>per se</u> and rule of reason tying claims at this juncture. Tying arrangements "can be deemed illegal <u>per se</u> or be found to violate the rule of reason. Per se liability exists where the defendant is found to have appreciable market power

allege that defendants <u>tied</u> MICROS' POS systems (the tying product) to Merchant Link's gateway (the tied product). This is because the merchants, the purchasers of the tying product, are not required by defendants' agreement to <u>purchase</u> the services of Merchant Link. Merchant Link charges a per transaction fee <u>to processors</u> like Heartland, while charging no fee to merchants. Though merchants do not have to pay a per transaction fee to Merchant Link for its services, i.e., they receive the Merchant Link gateway for free, merchants who purchase a MICROS POS system are allegedly required to use Merchant Link - and only Merchant Link - as the interface for their MICROS POS system. In other words, a condition of purchasing the tying product is that the merchant may not purchase the tied product from any other supplier, i.e., a competing gateway company.[7]

Defendants argue that these allegations fall short of an illegal tie. They argue that a tying claim requires that, as condition of purchasing the tying product, the purchaser of the tying product must also <u>purchase</u> the tied product. Since merchants buy the MICROS system, the tying

---

in the tying market. In such cases, the ability to leverage this power to restrain trade in the tied market is presumed and no inquiry need be made into the actual prevailing market conditions in that market. <u>See</u> <u>Jefferson Parish</u>, 466 U.S. at 15-18 & n. 25, 104 S.Ct. at 1559-61 & n. 25; <u>Town Sound</u>, 959 F.2d at 477. Where appreciable tying market power cannot be shown, inquiry into the tied product market cannot be avoided, and the plaintiff therefore has the more difficult burden of showing that the arrangement violated the rule of reason because it unreasonably restrained competition in the tied product market. <u>See</u> <u>Jefferson Parish</u>, 466 U.S. at 29, 104 S.Ct. at 1567." <u>Brokerage Concepts</u>, 140 F.3d at 511. MICROS' market power in the tying market is not at issue in the present motion.

[7]Defendants argue that the complaint merely alleges that the tie forces merchants to take gateway services from Merchant Link rather than to agree to not purchase an alternative interface for their MICROS system from any other supplier. Reply Brief, 7. This ignores allegations in the complaint: "Defendants have conspired to squash competition . . . by forcing merchants who buy MICROS POS systems to use Paymentech's gateway," Complaint, ¶ 36; Defendants "entered into an agreement pursuant to which MICROS' devices exclusively use Merchant-Link services for the transmission of electronic transactions," <u>Id.</u> ¶ 37; "MICROS . . . imposes on purchasers of POS systems the condition that they use only Merchant Link." <u>Id.</u> ¶ 40.

product, but processors like Heartland (and not merchants) pay the per transaction fee for Merchant Link's interface, the tied product, defendants argue that Heartland's tying claim must fail. Defendants cite two cases for this critical proposition, but both are inapposite.

First, defendants cite Kellam Energy Inc. v. Duncan, 668 F.Supp. 861 (D. Del. 1987), which held that "[a]s a precondition of a tying claim, the buyer must actually purchase or lease the unwanted product. Merely accepting something provided for free does not constitute an impermissible tie in."Id. at 668 F. Supp. at 881. In Kellam, the tying product was gasoline and the alleged tied product was gasoline dispensing equipment: "Nehi asserts that it was forced to accept Kellam owned dispensing equipment in order to purchase Kellam's gasoline." Id. at 880. The court rejected the tying claim because "[n]othing in the record indicates that Nehi either leased or bought any gasoline dispensing equipment from Kellam." Id. at 881. But Kellam is distinguishable because, unlike the case at bar, there was no requirement that the plaintiff refrain from purchasing the alleged tied product, gasoline dispensing equipment, from competing suppliers, whereas here, merchants are precluded from purchasing gateway services from another supplier. See Id. at 882 (no requirement in the contract that plaintiff could not use or purchase dispensing equipment from another supplier). Tying constitutes "an agreement by a party to sell one product but only on the condition that the buyer purchases a different product, or at least agrees that he will not purchase that product from any other supplier." Eastman Kodak, 504 U.S. at 461 (quoting N. Pac. Ry. Co., 356 U.S. at 5-6).

Second, defendants rely on the Third Circuit's decision in Brokerage Concepts. This case makes clear that Heartland's allegations do not assert the typical tying claim: "In a typical tying case, a seller leverages its market power in the market for the tying product to require the buyer

12

of the product to purchase an unwanted product in the tied market, thereby (unlawfully)

foreclosing competition in that market." Brokerage Concepts, 140 F.3d at 502 (emphasis added).

However, Brokerage Concepts does not hold that the purchase of the tying product must be

conditioned on the purchase of the tied product by the same purchaser, rather than conditioned on

the purchaser's agreement not to buy the tied product from any other supplier. Instead, Brokerage

Concepts stands for the proposition that a tying arrangement requires that the plaintiff be a

purchaser in the tying market. In Brokerage Concepts, the defendant HMO conditioned

membership in its provider network on a pharmacy's agreement to use the defendant HMO's

subsidiary, and not the plaintiff, as a third party administrator for the pharmacy's self-insurance

health plan. Brokerage Concepts, 140 F.3d at 501. The plaintiff argued that this constituted a

tying arrangement: the tying product was the membership in the provider network and the tied

product was health plan administration services.  The Third Circuit rejected this argument as

follows:

> BCI argued, and the jury found, that U.S. Healthcare and CHA tied the purchase
> of CHA's TPA [, i.e., third party administration] services to the right to continued
> participation in the U.S. Healthcare pharmacy network. In order to characterize
> this arrangement as a tie, U.S. Healthcare must be deemed to have "sold" Gary's
> the ability to participate in its pharmacy network, but only if Gary's also purchased
> CHA's TPA services. Defendants contend that BCI's characterization is not correct
> since U.S. Healthcare did not "sell" Gary's the ability to participate in the
> pharmacy network as participation in that network is free. In fact, the ultimate
> result of the contract was that money flowed in the opposite direction-from U.S.
> Healthcare to Gary's in exchange for prescription drugs purchased by U.S.
> Healthcare members that designated one of Gary's stores as their network
> pharmacy.
> We agree that the arrangement is not tying.

Id. at 511. In short, the court found that because the defendant HMO did not "sell," and the

pharmacy did not purchase, the asserted  tying product, membership in the HMO's network, the

13

arrangement "was not tying." Id. In the case at bar, there is no question that merchants purchase the tying product, MICROS' POS system. The issue is whether the fact that merchants receive the tied product for free (contrary to the standard gateway fee arrangement), while processors like Heartland pay a per transaction fee for the tied product, bars a tying claim. Brokerage Concepts simply does not address that question.

In support of the proposition that the same purchaser need not purchase both the tying and tied products in a tying arrangement, so long as the purchaser of the tying product is not permitted to purchase the tied product from other suppliers, Heartland cites language from the Supreme Court's decisions in Eastman Kodak and N. Pac. Ry. Co.: "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" Eastman Kodak, 504 U.S. at 461-62 (quoting N. Pac. Ry. Co., 356 U.S. at 5-6 ) (emphasis added). Though this description of a tie is applicable to the case at bar, the facts of each case are not analogous to the facts here. In Eastman Kodak, Kodak sought to make it more difficult for independent service organizations ("ISO's") to compete with Kodak in the market for servicing Kodak micrographic and copying machines. Eastman Kodak, 504 U.S. at 458. Since "Kodak would sell parts to third parties only if they agreed not to buy services from ISO's," so as to force third parties to deal only with Kodak for service contracts, Eastman Kodak, 504 U.S. at 464, in the case at bar, MICROS allegedly sells POS machines to merchants "only if they agreed not to buy services from" any suppliers in the interface market except for Merchant Link.

However, unlike Eastman Kodak, the purchasers of the tying product receive the tied product for free, and third parties, processors like Heartland, pay for the tied product. The tying

14

arrangement in <u>Eastman Kodak</u> contemplated that purchasers of the tying product, parts for Kodak machines, <u>would also have to purchase the tied product</u>, Kodak's maintenance services. <u>Id.</u> at 463 n. 8 (describing tying arrangement as "the alleged sale of parts to third parties on condition they <u>buy</u> service from Kodak"). In the case at bar, merchants, the purchasers of the tying product, receive Merchant Link's gateway services, the tied product, for free. Further, <u>Eastman Kodak</u> did not address the question raised here, i.e., whether a claim of tying requires that the same buyer purchase the tying and tied products. <u>N. Pac. Ry. Co.</u> is also distinguishable in that the purchase of the tying product, land owned by a rail road company, was conditioned on the <u>purchase</u> of the railroad's services in shipping commodities produced or manufactured on the land. <u>N. Pac. Ry. Co.</u>, 356 U.S. at 3. In other words, the tied product was not provided to the purchaser of the tying product for free.

In sum, though the language (but not necessarily the specific facts) of <u>Eastman Kodak</u> seems applicable, neither party has cited an analogous case to the Court, i.e., one where as a condition of purchasing the tying product, the purchaser is required to use (though need not purchase) the tied product, which is paid for by a third party. Although defendants complain that Heartland has failed to cite a case where a company was held liable for tying despite providing the tied product for free, Defendants Reply Brief, 7, defendants have failed to cite a case for the proposition that a tying claim requires that the purchaser of the tying product directly purchase the tied product as well, at least when the purchaser of the tying product is precluded from purchasing the tied product from another supplier.

In the absence of dispositive authority one way or the other, but mindful of the applicable language in Eastman Kodak, the Court turns to the rationale underlying the Sherman Act's prohibition of tying arrangements. The Supreme Court has explained:

> Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.
> "Basic to the faith that a free economy best promotes the public weal is that goods must stand the cold test of competition; that the public, acting through the market's impersonal judgment, shall allocate the Nation's resources and thus direct the course its economic development will take.... By conditioning his sale of one commodity on the purchase of another, a seller coerces the abdication of buyers' independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the open market. But any intrinsic superiority of the 'tied' product would convince freely choosing buyers to select it over others anyway."
> Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 605 (1953) (footnote omitted).

Jefferson Parish Hosp. Dist. No. 2. v. Hyde, 466 U.S. 2, 12-13 (1984). Though the Supreme Court discussed the coerced purchase of a tied product, the Court clearly identified the harm of a tying arrangement is the distortion of "independent judgment as to the 'tied' product's merits" and anti-competitive effects in the market for the tied product. The footnote attached to the above analysis provides: "There is general agreement in the cases and among the commentators that the fundamental restraint against which the tying proscription is meant to guard is the use of power over one product to attain power over another, or otherwise to distort freedom of trade and competition in the second product." Id. at 13 n. 19 (emphasis added).

The Third Circuit has made the same point. The prohibition against tying arrangements is concerned with "that danger when a seller leverages economic power from one market to

another." <u>Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.</u>, 959 F.2d 468, 476 (3d

Cir. 1992). The court has further explained:

> The Supreme Court's primary concern with tying arrangements has always been the use of tie-ins to abuse power in the tying market. Accordingly, it has condemned tying arrangements when the seller has some special ability-usually called "market power"-to <u>force a purchaser to do something that he would not do in a competitive market</u> . . .When the seller's power is just used to maximize its return in the tying product market, where presumably the product enjoys some justifiable advantage over its competitors, the competitive ideal of the Sherman Act is not necessarily compromised. But if that power is used to <u>impair competition on the merits in another market,</u> a potentially inferior product may be insulated from competitive pressures.

<u>Id.</u> (quoting <u>Jefferson Parish</u>, 466 U.S. at 13-14, 104 S.Ct. at 1558-59 (citations

omitted))(emphasis added). In <u>Brokerage Concepts</u>, the Third Circuit acknowledged that tying

arrangements implicate the "antitrust concern" over the "the unlawful extension of economic

power in one market to another market." <u>Brokerage Concepts</u>, 140 F.3d at 512.

Assuming Heartland's allegations to be true, defendants' scheme clearly implicates the

"antitrust concern" underlying tying arrangements. Heartland alleges that due to MICROS'

market power in the tying market, and hence the demand of restaurant merchants for MICROS

POS machines, Merchant Link can charge a supracompetitive per transaction fee in the tied

market, i.e., the interface market. Even though merchants are forced to <u>use</u> rather than <u>purchase</u>

Merchant Link's services, this still works an "unlawful extension of [MICROS'] economic

power in one market to another," <u>Id.</u>, i.e., from the POS system market to the interface market.

While it is true that Heartland is harmed by the stifling of competition in the processing market

rather than the interface market, the anti-competitive effect of defendants' arrangement in the

interface market, the tied market, is the <u>means</u> by which competition in the processing market is

17

allegedly being stifled. Paymentech is able to underbid Heartland and other processors because all processors, save Paymentech, are subject to Merchant Link's supracompetitive fee for gateway services in the tied market. Indeed, defendants' own explication of why tying arrangements are illegal, i.e., their anti-competitive effects, applies to the arrangement alleged by Heartland: "Tying arrangements are unlawful under the antitrust law because they have . . . [the] anticompetitive effect[] [that] the coerced buyer <u>cannot choose to buy the tied product from a competing seller</u> or to avoid buying the tied product at all." Defendant's Brief, 13 (emphasis added). Heartland alleges that, as a result of the tie between MICROS POS machines and Merchant Link's gateway, merchants "cannot choose to buy the tied product from a competing seller" of gateway services. Because the Supreme Court's description of a tying arrangement in <u>Eastman Kodak</u> (if not the facts of the case), as well as the "antitrust concern," underlying tying arrangements, applies to the case at bar, the Court finds that Heartland has adequately plead a tying claim, albeit an atypical one. <u>Brokerage Concpets</u>, 140 F.3d at 512.

Defendants further argue the conduct alleged in the Complaint does not implicate the law of tying because of its overall competitive reasonableness: "[T]here are significant benefits to MICROS from" the tying arrangement, i.e., the efficiency of "outsourc[ing] the gateway function to a single provider, Merchant Link, rather than multiple providers." Defendant's Reply Brief, 6. "Setting up and maintaining a connection to every gateway and processor would involve a material cost in time, personnel, and expense." <u>Id.</u> at 5. Thus, Defendants argue that Micros "made a rational business decision" to avoid these costs, and "[t]he resulting efficiencies are . . . passed on to its restaurant customers." <u>Id.</u> at 6. First, with respect to Heartland's <u>per</u> <u>se</u> tying claim, the burden of establishing the overall competitive reasonableness of MICROS' tying

arrangement with the other defendants (once the elements of <u>per se</u> tying are established) is on

defendants, not Heartland. "Assuming that the elements [of <u>per se</u> tying] are met, the defendant

may still justify the restriction by proving its overall competitive reasonableness, making the

tying <u>per se</u> test altogether different from true standards of per se illegality."Antitrust Law

Handbook, § 2:18 (2007). As such, Defendants argument requires proofs, and cannot be resolved

in a motion to dismiss, unless Heartland's allegations establish the competitive reasonableness of

the tying arrangement.  They do not.

 Heartland alleges that "there is . . . no legitimate business reason that merchants be forced

to use Merchant Link over any other third party gateway provider or the processor's own

interface . . . There is no increased efficiency or security associated with use of Merchant Link.

There is nothing special about the 800 numbers, dedicated lines or internet gateway offered by

Merchant Link. Indeed, these same services are provided by - and, in practice, are actually

rendered by - the processor." Complaint, ¶ 43. In other words, Heartland claims that it provides

much of, or at least some of, the technical support burden involved in maintaining a connection

between a MICROS POS machine and the processor. <u>Id.</u> ¶ 50. This is inconsistent with

defendants' argument that the tying arrangement alleged in the complaint is designed to

minimize its technical support burden, as Heartland would allegedly provide that support in any

event.[8] In any event, even assuming that the tying arrangement reduces MICROS' technical

support burden, whether this is sufficient to establish the competitive reasonableness of the

---

[8]Heartland's allegations on this point are admittedly confusing. For if processors like Heartland address the technical issues involved in maintaining a connection between a POS machine and the processor even absent the tying arrangement, it is unclear how Heartland can allege that "the effect of the Merchant Link tie shifts the entire technical support burden away from MICROS and its distributors and puts the burden and expense on the processor." Complaint, ¶ 8.

MICROS-Merchant Link tie cannot be determined based on the pleadings - at least the pleadings in the case at bar.[9] Defendants' argument that Heartland's tying claim fails because of the tie's pro-competitive justifications cannot be resolved at this stage.

**2. Does Heartland Have Standing to Bring Its Tying Claim?**

"Because of the infinite variety of claims that arise under the antitrust statutes, [the Supreme Court] has refused to fashion a black-letter rule for determining standing in every case." Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 922 (3d Cir. 1999) (quoting Merican, Inc. v. Caterpillar Tractor Co., 713 F.2d 958, 964 (3d Cir.1983)). When assessing a Plaintiff's standing to bring antitrust claims, "[t]he [Supreme] Court has emphasized that lower courts should avoid applying bright-line rules and instead should analyze the circumstance of each case, focusing on certain key factors." Id. at 922. In Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 545 (1983), the Supreme Court articulated a five-factor balancing test for antitrust standing. The Third Circuit has expressed these factors as follows:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 320 (3d Cir. 2007).

---

[9]Even though Heartland retains the burden of establishing the competitive unreasonableness of the tying arrangement with respect to its rule of reason tying claim, the fact that the tying arrangement may relieve MICROS of some its technical support burden does necessarily mean that Heartland cannot meet its burden.

The second factor deals with the concept of antitrust injury. "If the injury is not of the requisite type, even though the would-be plaintiff may have suffered an injury as a result of conduct that violated the antitrust laws, he or she has no standing to bring a private action under the antitrust laws to recover for it." Barton & Pittinos, Inc. v. SmithKline Beecham Corp., 118 F.3d 178, 181 (3d Cir. 1997). "Antitrust injury is a necessary but not insufficient condition of antitrust standing." Id. at 182. (citation omitted) "Even a plaintiff who can show antitrust injury may lack antitrust standing, because the remaining . . . factors may weigh against allowing him or her to sue under the antitrust laws." Id.

Defendants argue that Heartland lacks a cognizable antitrust injury with respect to its tying claim, and hence that Heartland lacks standing to bring that claim. Defendants Brief, 12-14. The Third Circuit explained the concept of antitrust injury in Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.,113 F.3d 405 (3d Cir. 1997) as follows:

> [P]laintiffs ... must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

Schuylkill Energy Resources, 113 F.3d at 413 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)). Further, the court stated:

> The antitrust laws are intended to preserve competition for the benefit of consumers in the market in which competition occurs . . . . The requirement that the alleged injury be related to anti-competitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors . . . .A plaintiff who is neither a competitor nor a consumer in the relevant market does not suffer antitrust injury.

Id. at 415 (quoting Vinci v. Waste Management, Inc., 80 F.3d 1372, 1376 (9th Cir.1996)). "It is well established that an antitrust injury reflects an activity's anti-competitive effect on the competitive market." Casper v. SMG, Docket No. 00-3465, 2006 WL 3111132, *4 (D.N.J. Oct. 31, 2006).

In the context of a tying claim, an actionable injury must "reflect the anti-competitive effect either of the [tying arrangement] or of anticompetitive acts made possible by the [tying arrangement.]" Schuylkill Energy Resources, 113 F.3d at 413. "[I]n order to determine whether Plaintiff has standing to assert the tying claim, the Court must examine whether [it] suffered the type of harm that results from an illegal tying arrangement." Casper, 2006 WL 3111132 at *5. "Illegal ties, because of their restraint on competition, principally cause two types of harm. First, the tie injures buyers of the tied product by foreclosing consumer choice . . . Second, the tie injures competitors in the tied market." Id. at *4-5. Defendants argue that Heartland has failed to allege that it has suffered either sort of injury. The Court disagrees.

As a purchaser of the tied product, Merchant Link's gateway services, which are paid for on a per transaction basis, Heartland "suffer[s] the type of harm that results from an illegal tying arrangement." Id. at *4. Since "antitrust injury reflects an activity's anti-competitive effect on the competitive market," Id., the Court must consider the anti-competitive effects of the alleged tying arrangement on the market for the tied product, Merchant Link's gateway services. See Jefferson Parish Hosp. Dist. No. 2., 466 U.S. at 13 n. 19. ("There is general agreement in the cases and among the commentators that the fundamental restraint against which the tying proscription is meant to guard is the use of power over one product to attain power over another, or otherwise to distort freedom of trade and competition in the second product"). Heartland alleges that, as a

result of the tie between MICROS POS systems and Merchant Link's gateway, competition in the interface (or more specifically, the gateway) market is stifled, and Merchant Link is able to charge a supracompetitive fee for its gateway. Heartland is the direct purchaser who pays that supracompetitive fee, and Heartland's injury of paying a supracompetitive gateway fee is precisely the kind injury that motivates the Sherman Act's concern with tying arrangements. "The requirement that the alleged injury be related to anti-competitive behavior requires . . . that the injured party be a participant in the same market as the alleged malefactors." <u>Schuylkill Energy Resources</u>, 113 F.3d at 415.  Heartland participates in the pertinent market as a consumer of the tied product, and as such, has standing to bring its tying claim.

Defendants argue that Heartland's claim that it is "a direct purchaser of the tied service' misses the point; Heartland lacks standing because it does not purchase the tied product <u>as a condition of buying</u> the 'tying' product." Defendant's Reply Brief, 12 (emphasis in original). However, defendants cite no authority for this proposition, which is inconsistent with <u>Eastman Kodak</u>'s statement that a "tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer . . . <u>agrees that he will not purchase that product from any other supplier.</u>'" <u>Eastman Kodak</u>, 504 U.S. at 461-62 (quoting <u>N. Pac. Ry. Co.</u>, 356 U.S. at 5-6) (emphasis added).

Moreover, defendants' interpretation of antitrust injury would render the tying arrangement alleged in Heartland's complaint unchallengeable. Heartland would lack standing because it does not purchase the tying product, a MICROS system. Merchants, which defendants misleadingly claim would have standing to challenge the alleged tying arrangement because they are the purchasers of the MICROS system, Defendant's Brief, 13, would, however, on

defendants' theory, also lack standing because they do not <u>purchase</u> the services of Merchant

Link. Further, the "general rule that only direct purchasers from antitrust violators may recover

damages in antitrust suits," <u>Howard Hess Dental Laboratories Inc. v. Dentsply Intern., Inc.</u>, 424

F.3d 363, 369 (3d Cir. 2005), suggests that Heartland, <u>more so than its merchant customers</u>, has

suffered antitrust injury in the case at bar. While Heartland is the direct purchaser of the tied

product, whose price has allegedly been inflated by defendants' tying arrangement, merchants

only suffer the indirect injury of "passed on" overcharges from processors like Heartland, which

is not actionable under the Sherman Act. <u>Id.</u> at 369.

Because Heartland has sufficiently plead that it suffers antitrust injury as a result of

defendants' alleged tying arrangement, i.e., the increased costs it faces as a purchaser in the tied

market, defendants argument that Heartland lacks standing to bring its tying claim fails.[10]

## C. Heartland's Unreasonable Restraint of Trade Conspiracy Claim

---

[10] It should be emphasized that suffering an antitrust injury is a necessary, but not sufficient, condition for antitrust standing. As such, on a subsequent motion, defendants may still argue that Heartland lacks standing based on the remaining factors enumerated in <u>Broadcom Corp</u>, 501 F.3d at 320, or that Heartland lacks standing to pursue certain damages, namely, damages that pose a risk of duplicative recovery.  <u>See, e.g.</u>, <u>International Raw Materials, Ltd. v. Stauffer Chemical Co.</u>, 978 F.2d 1318, 1329 (3d Cir. 1992) ("Because the industrial consumers of soda ash, for example, could still bring suit and raise these same claims, permitting [the plaintiff] to go forward with this claim creates the risk of duplicative recovery.") Moreover, courts have barred antitrust claims even where the risk of duplicative recovery is minimal. <u>See</u> <u>Howard Hess Dental Laboratories Inc. v. Dentsply Intern., Inc.</u>,424 F.3d 363 (3d Cir. 2005) (finding plaintiff did not have antitrust standing as an indirect purchaser where direct purchasers formally released the defendant from antitrust liability);  <u>Merican, Inc. v. Caterpillar Tractor Co.</u>, 713 F.2d 958 (3d Cir. 1983) (precluding an indirect purchaser from asserting an antitrust claim because of the risk of duplicative recovery where direct purchaser stated in an affidavit it had not suffered any injury from the alleged antitrust conspiracy.).  On this motion, no argument as to these factors has been presented by defendants to provide the Court a basis for assessing standing on these grounds.

The Third Circuit has laid out the elements of a general antitrust conspiracy claim as

follows:

> Section 1 of the Sherman Act provides in pertinent part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal." 15 U.S.C. § 1. For a section 1 claim under the Sherman Act, "a plaintiff must prove 'concerted action,' a collective reference to the 'contract ... combination or conspiracy.' " Big Apple BMW, 974 F.2d at 1364 (quoting Bogosian v. Gulf Oil Corp., 561 F.2d 434, 445 (3d Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978)), cert. denied, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). A " 'unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement' " must exist to trigger section 1 liability. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771, 104 S.Ct. 2731, 2742, 81 L.Ed.2d 628 (1984) (quoting American Tobacco Co. v. United States, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)). In addition to the element of concerted action, a plaintiff must prove that anticompetitive effects were produced within the relevant product and geographic markets; that the objects of the conduct pursuant to the concerted action were illegal; and that it was injured as a proximate result of the conspiracy. Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1229 (3d Cir.), cert. denied, 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993).

Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996).

Heartland alleges that defendants "have conspired . . . to raise the costs of Paymentech's

competitors and thereby given Paymentech control over a substantial portion of the market for

restaurant processing services in the United States." Complaint, ¶ 72. Defendants argue that

Heartland's claim must be dismissed for two reasons: (1) the complaint provides no factual

predicate to suggest that Paymentech conspired with MICROS and Merchant Link, and thereby

advances the unviable theory that Paymentech has engaged in the conspiracy solely through the

acts of its subsidiary, Merchant Link; and (2) the alleged conspiracy to stifle competition in the

processing market is implausible on its face because the complaint indicates no plausible reason

why MICROS would engage in the conspiracy with Merchant Link and Paymentech. Both arguments are unavailing, at least at the pleadings stage.

The first argument is based on a misreading of the complaint, which clearly indicates Paymentech's involvement in the conspiracy: "[T]he increased cost imposed on Paymentech's competitors [via Merchant Link's gateway fees] weakens competition, raises the cost of processing on MICROS POS systems across the board (save [for] Paymnetech), and allows Paymetech to increase its price to merchants while still underbidding its competitors every time," Id. ¶ 36; "[The] scenario of Paymetech riding to the rescue of merchants disappointed by the undisclosed [Merchant Link] fee is not an isolated incident but is occurring with greater frequency to all of Paymetech's competitors, as Paymetech slowly corners the market on MICROS Processing, Id. ¶ 47; Paymentech is able to "learn from Merchant Link every time another MICROS POS system has been sold to a restaurant and is need of processing," Id. ¶ 58; after merchants discover Merchant Link's supracompetitive fees, "[t]he merchant is told (most often by its MICROS distributor) that if he switches his processing to Paymentech, Paymentech . . . will be able to charge a lower rate than that available from Heartland," Id. ¶ 52; "Merchant Link assists in the conspiracy by alerting Paymentech every time a new MICROS customer begins processing, and thus paying the Merchant Link fees." Id. ¶ 58. Though the complaint does not allege any specific communication or meeting between MICROS and Paymentech, these allegations provide enough facts to nudge Heartland's claim of concerted action between MICROS, Merchant Link and Paymentech beyond the speculative level. See Fuentes v. South Hills Cardiology, 946 F.2d 196, 202 (3d Cir. 1991) ("Although Fuentes does not allege any meetings or phone calls at which this [antitrust] conspiracy was carried out, his allegations

identifying the conspiracy's participants, purpose and motive are sufficient to survive a motion to dismiss").

This is consistent with the standard articulated in Twombly, which held that "[i]n applying . . . general [Rule 12(B)(6)] standards to a § 1 [Sherman Act] claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." Twombly, 127 S.Ct. at 1965. The complaint must provide "plausible ground to infer an agreement" and "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." Id. (emphasis added); see also Id. ("And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'") (citation omitted). Unlike in Twombly, where the defective § 1 complaint was based merely on an "allegation of parallel conduct and a bare assertion of conspiracy," Id. at 1966, where the "parallel conduct could just as well be independent action," Id., Heartland's complaint lays out Paymentech's participation in a scheme to inflate its processor-competitors costs, underbid those competitors, and share the fruits of the scheme with MICROS. This is enough to infer an agreement between defendants. Thus, defendants' argument that the complaint must be dismissed because it fails to allege some sort of specific communication between Heartland and MICROS misses the mark.[11]

Next, defendants argue that Heartland's conspiracy claim should be dismissed because it is economically implausible: "MICROS in particular would have no incentive to enter into a

___

[11]Further, because the complaint contains allegations of Paymentech's involvement in the scheme independent of the fact that Merchant Lank is a subsidiary of Paymentech, defendants' argument that the complaint "ignor[es] Merchant Link's separate corporate existence" fails. Defendants Brief, 17.

conspiracy to restrain competition in the payment card processing industry to the detriment of its

POS systems merchant customers." Defendant's Brief, 18. The reason is that "it would be

entirely inconsistent with MICROS' economic interest to restrain competition in the processing

market or to artificially limit in any way the competitive choices its customers have for

processing their payment card transactions. Any such limitation would render MICROS' POS

systems less competitively attractive and would lead to losses in goodwill and revenues." Id. at

20.

      Defendants are correct that Section 1 conspiracy theories that "make no economic sense"

are subject to dismissal. Brunson Commc'ns, Inc. v. ArbitronFurth, Inc., 239 F. Supp. 2d 550,

563 (E.D. Pa. 2002) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.

574, 587 (1986). As another district court in this Circuit recently explained:

> The Supreme Court has found that 'antitrust law limits the range of permissible
> inferences from ambiguous evidence in a Section One case.' Where a defendant
> had no rational motive to join a conspiracy, and defendant's conduct is as
> consistent with permissible competition as with illegal conspiracy, the plaintiff's
> unspecific allegations do not support an inference of antitrust conspiracy. Thus, as
> the court in Matsushita explained, if the defendants 'had no rational economic
> motive to conspire, and if their conduct is consistent with other, equally plausible
> explanations, the conduct does not give rise to an inference of conspiracy.'

Id. at 563; see also DM Research, Inc. v. College of American Pathologists, 170 F.3d 53, 56 (1st

Cir. 1999) (dismissing a complaint because, inter alia, "no antitrust lawyer could help but ask

almost immediately why National and the College would conspire" as alleged in the complaint")

(emphasis in original).

      However, at least at this stage of the proceedings, the Court cannot confidently say that it

is implausible that MICROS would participate in the alleged scheme with Merchant Link and

Paymentech. Defendants point out that limiting restaurant merchants' choices in the interface and processing markets though the alleged scheme makes Micors POS systems less desirable than MICROS' competitors, begging the question of <u>why</u> MICROS would participate in such a scheme. But the Complaint provides a plausible explanation why MICROS would use its market power in the way described in the complaint: as consideration for its agreement with Merchant Link and Paymentech, MICROS receives financial consideration. "Part of the Merchant Link fee collected by Paymentech is paid by Paymentech to MICROS. This per-transaction stream of revenue is hidden from MICROS' customers and allows MICROS to secretly derive revenue over and above what it achieves from the sales and services of its POS systems." Complaint, ¶ 8; <u>see also</u> <u>Id.</u> ¶ 48.

Defendants respond that it makes no economic sense for MICROS to exploit its market power in the manner alleged in the complaint. "On the facts alleged in the Complaint, [i.e., given MICROS' market power,] MICROS could simply raise its price by the amount of the fee it allegedly receives from Paymentech; it would have no reason to conspire with Paymentech." Defendants Reply Brief, 14. Moreover, doing so would allow MICROS to profit without "sharing" with Merchant Link and Paymentech. Defendants Brief, 21, n. 4. But this argument ignores Heartland's allegations that (1) MICROS conceals the scheme alleged in the complaint from its merchant customers,[12] Complaint, ¶51 ("MICROS sales personnel intentionally conceal

---

[12]Defendants argue that Heartland's allegations of "concealment" are inconsistent with other allegations in the complaint, specifically that Heartland's billing practices reveal Merchant Link fees to the merchant, Complaint, ¶ 52 n. 1, and that MICROS distributors "confirm" the Merchant Link fees to merchants. <u>Id.</u> ¶ 45. Of course, the allegation required for Heartland's explanation of MICROS' motivation to engage in the alleged conspiracy (and the allegation actually contained the complaint) is not that merchants <u>never</u> learn about Merchant Link's supracompetitive fees, but that they learn about the fees <u>after</u> they purchase their MICROS POS machine, and are "locked in" to the agreement between MICROS and Merchant Link. Thus,

the Merchant Link fee from prospective merchants prior sale [and] [c]onsequently, the vast
majority of merchants who purchase a MICROS POS system do not find out . . . about the
exorbitant Merchant Link fees until after they have purchased their MICROS POS system"); see
also Id. ¶¶ 8; 40-41; 45; and (2) that merchants are "locked in" to their decision to purchase a
MICROS POS system because of its high cost, Id. ¶ 51 ("[T]he cost of switching to a different,
non-MICROS POS system so as to avoid the Merchant Link fee is too high for most, if not all,
restaurant merchants . . . [and] [a]s such,, these restaurants are 'locked-in' to the MICROS-
Merchant Link conspiracy"). These considerations provide a plausible explanation why MICROS
would engage in the alleged scheme instead of increasing its prices directly: to profit from its
market power in the POS system market (through a cut of the profits generated by its tying
arrangement with the other defendants) without its merchant customers knowing, and hence
without negatively impacting its market share, revenue and goodwill in the POS system market
(at least not enough to outweigh the benefits of the alleged scheme). Once the merchants find out
about the agreement between MICROS and Paymentech, they are "locked in" because they have
already purchased a MICROS POS machine. If MICROS were to simply increase the price of its
POS systems, merchants would be aware of the increased costs associated with using a MICROS
POS system before purchasing one, and this would be more likely to negatively impact
MICROS' market share, revenue and good will in the POS system market. In short, the
allegations in the complaint are sufficient to suggest a rational economic motivation for MICROS
to participate in the conspiracy alleged in the complaint. Thus, defendants' argument that

---

Heartland's concealment theory is consistent with the allegations of the Complaint, and must be
considered when assessing whether the alleged conspiracy is plausible, i.e., makes economic
sense.

Heartland's conspiracy claim must be dismissed because it makes no economic sense for MICROS to participate in the conspiracy fails.

**D.  Heartland's  State Law Claim**

Pursuant to 28 U.S.C. § 1367(a), in any civil action where the court has original jurisdiction, the federal courts can hear additional claims substantially related to the original claim even though the court would lack the subject-matter jurisdiction to hear such additional claims independently. The Court has original jurisdiction over Heartland's antitrust claims pursuant to 28 U.S.C. § 1331. Since defendants' motion to dismiss Heartland's federal claims is denied, Heartland's state law claim remains.

**IV. Conclusion**

For the foregoing reasons, Defendant's motion to dismiss Plaintiffs § 1 tying and conspiracy claims, as well as Heartland's state law claim, is denied.